IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

BARBARA L. McGUIRE,        )
        )
      Plaintiff,       )
        )
v.        )      CIVIL ACTION NO. 5:07-00254
        )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,        )
        )
      Defendant.       )

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Supplemental Security Income (SSI), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently pending before the Court on the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 9 and 11.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 5 and 6.)

The Plaintiff, Barbara L. McGuire (hereinafter referred to as "Claimant"), filed an application for SSI on October 27, 2004 (protective filing date), alleging disability as of March 1, 2004, due to chronic fibromyalgia, difficulty standing and walking, pain in her hands and legs, acid reflux, and irritable bowel syndrome. (Tr. at 12, 51, 103, 107.) The claim was denied initially and upon reconsideration. (Tr. at 51-53, 56-58) On May 2, 2005, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 54.) The hearing was held on August 17, 2006, before the Honorable R. Neely Owen. (Tr. at 255-94.) By decision dated October 17, 2006, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 12-22.) The ALJ's decision became the final decision of the Commissioner on February 21, 2007, when the Appeals Council denied

Claimant's request for review. (Tr. at 5-7.) On April 26, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.

20 C.F.R. §§ 404.1520(f), 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace),

we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that the earnings record was inconsistent with Claimant's claim that she was disabled on March 1, 2004, "and is indicative of a capacity for work beyond March 1, 2004, certainly at the level of substantial gainful work activity." (Tr. at 14, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from fibromyalgia, hypertension, and obesity, which were severe impairments. (Tr. at 14, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 14-15, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity for work at the light level of exertion, as follows:

> [C]laimant has the residual functional capacity to perform light work requiring lifting up to twenty pounds occasionally and ten pounds frequently, standing and/or walking about six hours in an eight-hour workday, sitting about six hours in an eight-hour workday, unlimited pushing and/or pulling including operation of hand and/or foot controls, and occasionally climbing, stooping, and kneeling but never balancing, crouching, or crawling, with no manipulative, visual, communicative or environmental limitations other than avoiding even moderate exposure to vibrations, and avoid concentrated exposure to extreme heat and cold, and working in hazardous conditions including moving machinery and heights.

(Tr. at 15, Finding No. 4.) At step four, the ALJ found that Claimant could return to her past relevant work as a waitress and a sewing machine operator. (Tr. at 21, Finding No. 5.) On this basis, benefits

were denied. (Tr. at 21-22, Finding No. 6.)

<u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying

the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was

defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d

640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the

Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>,

495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by

substantial evidence.

<u>Claimant's Background</u>

Claimant was born on March 6, 1960, and was 46 years old at the time of the administrative

hearing. (Tr. at 103, 262.) Claimant had a high school education. (Tr. at 110, 263.) In the past, she

worked as a daycare provider, waitress, sewing machine operator, and bartender. (Tr. at 121-27, 264,

287.)

<u>The Medical Record</u>

The Court has reviewed all the evidence of record, including the medical evidence, and will

6

discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

      Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in (1) according greater weight to the opinions of the state agency medical consultants than to the opinions of Claimant's treating physicians, (2) not finding that Claimant's depression was a severe impairment, and (3) assessing Claimant's pain and credibility. (Document No. 10 at 8-11.) The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Document No. 11 at 8-20.)

1. Opinion Evidence.

      Claimant first alleges that the ALJ erred in according greater weight to the opinions of the two state agency medical consultants, Dr. Go-Lee and Dr. Lambrechts, than to the opinions of her treating physicians, Dr. Byrd and Dr. Swarm. (Document No. 10 at 8-10.) Claimant states that the non-examining, reviewing, state agency medical consultants formed their opinions in early 2005, which was approximately nineteen to twenty months prior to the administrative hearing. (Id. at 9.) She contends that if the "Court endorses this type of analysis in ALJ decisions, it is certainly not difficult to imagine a flood of unfavorable decisions using this very simple approach by the ALJ in this case." (Id. at n. 2.) Claimant further contends that the ALJ failed to consider all the factors set forth in 20 C.F.R. § 404.1527. (Id.)

> Simply put, [Claimant] had a fairly lengthy and constant treating relationship with Dr. Byrd, a specialist who over time compiled a great deal of familiarity with the [Claimant] and her abilities and impairments. . . . although Dr. Swarm did not have a lengthy treating relationship with the [Claimant], at least Dr. Swarm unlike the Agency physicians, was able to evaluate the Claimant prior to offering an opinion.

(Id. at 9-10.)

      The Commissioner asserts that despite Claimant's allegation that the state agency medical

consultants' opinions were rendered several months prior to the administrative hearing, Claimant "has failed to show any significant change in the objective medical findings or course of treatment after the state agency physicians issued their opinions." (Document No. 11 at 9.) The Commissioner contends that the minimal treatment notes following Dr. Lambrecht's August, 2005, opinion, do not document any significant changes and if anything, demonstrate that Claimant's condition improved after he issued his opinion. (Id.) Regarding Claimant's allegation that the ALJ may not rely on state agency medical consultants' opinions in making a determination of disability, the Commissioner asserts that an ALJ always has been entitled to rely on such opinions. (Id.) Such reliance is authorized by 20 C.F.R. § 404.1527(f)(2). (Id.) The Commissioner further asserts that the ALJ thoroughly reviewed Dr. Byrd's opinion and determined that it was not consistent with the evidence of record, and noted that the record failed to evidence any treatment notes from Dr. Swarm, which would support his opinion. (Id. at 10-12.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In

determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20

9

C.F.R. §§ 404.1545 and 416.946 (2004). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s) made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2006). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a

non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2004). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The opinion of a treating physician must be weighed against the record as a whole when determining

eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

The medical evidence reveals that Claimant was treated by John W. Byrd, M.D., a rheumatologist, from April 26, 2004, through June 1, 2006. (Tr. at 17-18, 20, 171-85, 233-36.). Claimant's initial treatment began one month after her alleged onset date. On April 26, 2004, Claimant reported that she was in good health except for "long standing aching, non-restorative sleep, tension-vascular headaches, and functional bowel type complaints." (Tr. at 185.) On examination, Claimant had multiple tender points compatible with fibromyalgia, though her neurological exam was normal. (Id.) Dr. Byrd diagnosed primary fibromyalgia, exogenous overweight, and labile hypertension, and prescribed Mirapex with Klonopin for fibromyalgia. (Tr. at 184.) She was cautioned about driving and operating dangerous equipment. (Id.) On July 22, 2004, Claimant reported that she was no better or worse with the medications, though she was tolerating it well. (Tr. at 178.) Dr. Byrd increased the dosage of her medication and prescribed Darvocet for pain. (Id.) On July 27, 2004, Claimant reported bad migraines and she was prescribed Imitrex. (Id.) Claimant reported leg swelling and pain on September 28, 2004, and was advised to change her fibromyalgia medication from Mirapex to Requip. (Tr. at 177.) On October 26, 2004,

Dr. Byrd acknowledged Claimant's reports of uncontrolled pain and fatigue and a depressive affect with some cognitive dysfunction. (Tr. at 176.) He increased her medication, opined that Claimant was "invalided at home," and stated that he had "[l]ittle more to offer at this point." (Id.)

Dr. Byrd noted that Claimant had subjectively improved on December 28, 2004, with Requip, though she had a significant weight gain over the holidays. (Tr. at 174.) Dr. Byrd continued Claimant's medications and encouraged her to diet and do low impact exercises. (Id.) On February 5, 2005, Claimant's exam revealed full lower back range of motion, limited only by obesity, normal straight leg raising, normal gait except for obesity, and normal motor, sensory, and reflex function. (Tr. at 172.) On February 21, 2005, Dr. Byrd opined that "[a]fter lengthy listening, [Claimant] is clearly not able to work." (Tr. at 171.) He changed Claimant's medications to Dyazide and Lortab. (Id.)

On February 28, 2005, state agency medical consultant, Russ L. Go-Lee, M.D., completed a form Physical Residual Functional Capacity ("RFC") Assessment, in which he opined that Claimant was capable of performing work at the sedentary level of exertion with occasional climbing of ramps or stairs, stooping, kneeling, crouching, and crawling, and never climbing ladders, ropes, scaffolds, or balancing. (Tr. at 17, 160-67.) Dr. Go-Lee further opined that Claimant's ability to reach in all directions, including overhead, was limited due to the pain in her arms and hands. (Tr. at 17, 163.) He also opined that Claimant should avoid even moderate exposure to vibration; fumes, odors, dusts, gases, and poor ventilation; and hazards, as well as any exposure to extreme cold and heat. (Tr. at 17, 164.) Though Claimant alleged that she was unable to sit long periods of time, Dr. Go-Lee noted that her activities of daily living, which included driving, shopping, managing finances, watching television, reading, and playing cards and board games with her family, were inconsistent with her allegations. (Tr. at 17, 165.) Dr. Go-Lee thus determined that Claimant was

partially credible to the extent that she would be restricted to sedentary work but not as to preclude all work-related activities. (Id.)

On May 12, 2005, Dr. Byrd noted that Claimant had incurred a scalp laceration when she fell in the shower. (Tr. at 17, 171.) He noted that her pain was under better control with the change in medications, and further noted that she exhibited some depressive symptoms, though she coped very well. (Id.) Dr. Byrd therefore, prescribed Effexor. (Id.)

On August 31, 2005, Dr. Marcel G. Lambrechts, M.D., another state agency medical consultant, opined that Claimant was capable of performing work at the light exertional level with occasional postural limitations to include climbing ramps or stairs, stooping, and kneeling, and never crouching, crawling, or climbing ladders, ropes, or scaffolds. (Tr. at 18, 200-07.) He further opined that Claimant should avoid concentrated exposure to extreme cold or heat, and even moderate exposure to vibration and hazards. (Tr. at 18, 204.) Dr. Lambrechts noted that Claimant's reports of more pain and less use of her arms and legs were inconsistent with the evidence of record. (Tr. at 18, 203.) He further noted that Claimant's "symptoms seem partly credible and partly supported by physical findings. She has symptoms of fibromyalgia. She is quite depressed and feels that she is getting worse. RFC is basically the same as before on 2/28/05." (Tr. at 18, 205.)

Claimant returned to Dr. Byrd on August 18, 2005, at which time she exhibited a brighter affect with the Effexor and some ankle edema. (Tr. at 17, 235.) On November 17, 2005, Dr. Byrd prescribed a new anti-depressant, Lyrica, and recommended that she see a psychiatrist for possible co-morbidity issues. (Id.) Dr. Byrd noted a modest weight loss on January 3, 2006, and changed her sleeping medication to Lunesta. (Tr. at 18, 234.) At that time, Dr. Byrd opined that Claimant "has significant cognitive dysfunction and a poorly controlled pain syndrome and, in my view, is totally disabled from all except self-care. Until better treatments come along, I suspect that she is not a

candidate for a rehab program." (Id.) On April 13, 2006, Dr. Byrd noted that Claimant exhibited an appropriate affect, was under better control with her current regimen, and had a modest weight loss with diet. (Tr. at 18, 233.)

On July 26, 2006, Dr. Byrd completed a form Medical Assessment of Ability to Do Work-Related Activities (Physical). (Tr. at 18, 237-41.) Dr. Byrd opined that Claimant's ability to lift or carry varied on a daily basis depending on the degree of pain and the severity of her cognitive function. (Tr. at 18, 238.) He opined that Claimant was capable of standing or walking less than two hours total, and for one hour without interruption, and incapable of sitting or standing in one position "very long" due to severe pain. (Tr. at 18, 239.) He imposed occasional postural limitations of climbing and balancing, and opined that Claimant should never stoop, crouch, kneel, or crawl due to disequilibrium, which caused her to fall. (Id.) He further assessed environmental restrictions of heights, moving machinery, and temperature extremes, based in part on Claimant's balance problems. (Tr. at 18, 240.) In summary, Dr. Byrd opined that Claimant "has major cognitive dysfunction, disequilibrium, and poorly controlled pain. In my view, totally disabled from all except self care." (Tr. at 18, 241.)

After Dr. Byrd retired, Claimant began treating with Dr. O. Swarm, D.O. (Tr. at 268.) As of the administrative hearing, August 17, 2006, Claimant reported that she had seen Dr. Swarm for two months. (Id.) On August 8, 2006, Dr. Swarm completed a further form Medical Assessment of Ability to Do Work-Related Activities (Physical). (Tr. at 18, 242-46.) Dr. Swarm opined that Claimant was capable of lifting one to three pounds occasionally and one pound frequently; could stand or walk a total of one hour and for five minutes without interruption due to the pain and swelling in her legs from the fibromyalgia; and could sit for four to five hours total and for forty-five minutes without interruption if she propped up her legs. (Tr. at 19, 244.) Dr. Swarm noted that

15

Claimant could not "sit comfortably for hours because of swelling of legs, stiffness of joints." (Id.)

Dr. Swarm further opined that Claimant could occasionally climb or balance and should never stoop,

crouch, kneel, or crawl due to intermittent palpitations with dizziness, which affected her balance.

(Id.) He noted that Claimant's ability to reach, handle, and feel was affected by her impairment, that

her grip strengths were decreased, and that she could push or pull ten pounds or less due to her

fibromyalgia. (Tr. at 19, 245.) Dr. Swarm also imposed environmental restrictions to include heights

and moving machinery due to dizziness and side effects from her medications, temperature extremes

due to the medications, dust due to seasonal allergy symptoms, and humidity and vibration. (Id.) In

summary, Dr. Swarm noted that Claimant "has poorly controlled pain secondary to fibromyalgia,

arthralgias, leg edema. She also exhibits disequilibrium and heart palpitations. Psychological issues

related to these ongoing co-morbidities also affect her. It is my opinion that she is disabled from all

except self-care." (Tr. at 19, 246.)

In his decision, the ALJ summarized the medical evidence of record and Claimant's

testimony. (Tr. at 14-21.) The ALJ adopted the opinions of the state agency medical consultants, and

discounted Dr. Byrd's opinions as follows:

> The opinion of Dr. Byrd that the claimant is not able to work (February 2005), and that she was totally disabled from all except self-care and was not a candidate for a rehabilitation program (November 2005) is not consistent with his initial conclusions that she needed followup with a primary care physician, should take pain medication for severe pain only, and also take an antidepressant and a diuretic. (Exhibit 11F.) His physical capacities assessment in June 2006 regarding the claimant's limited functional abilities are also based on his subjective conclusions and based on the claimant's subjective complaints and are not consistent with his long-term treatment records. His conclusions are based on her continued subjective reports of pain and inability to function without documentation of laboratory studies, functional capacities evaluation, or specialized treatment.

(Tr. at 21.) The ALJ concluded that the state agency medical consultants' opinions were "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and are not

16

inconsistent with the other substantial evidence in the record." (Id.) He noted that these state agency physicians provided specific reasons for their opinions, and demonstrated that they "included careful consideration of the claimant's allegations about her symptoms and limitations." (Id.) The ALJ also discounted the opinions of Dr. Swarm. (Tr. at 20.) He acknowledged that Dr. Swarm was Claimant's treating primary care physician, but noted that he neither was a specialist nor a long-term treating physician. (Id.)

Claimant alleges that the ALJ erred in according greater weight to the opinions of the state agency physicians than to the opinions of her treating physicians. The ALJ acknowledged Dr. Byrd's and Dr. Swarm's treating relationship to Claimant. Notwithstanding this relationship, the ALJ determined that Dr. Byrd's opinions were inconsistent with the substantial evidence of record. Though Dr. Byrd assessed stringent functional limitations, as the ALJ noted, his reasons for the limitations were based primarily on Claimant's subjective allegations. The ALJ further noted that Dr. Byrd's assessments were not consistent with his few clinical notes of normal range of motion, gait, straight leg raising, and motor, sensory, and reflex function. Though pain and fatigue, as well as sleep disturbances are primary symptoms of fibromyalgia, the evidence fails to demonstrate any functional limitations, resulting from Claimant's pain and fatigue that would support Dr. Byrd's stringent limitations. Furthermore, the evidence establishes that Claimant had treated with Dr. Swarm only for a period of two months prior to the date of his opinions and there is no evidence of any corresponding treatment notes. Both Dr. Byrd's and Dr. Swarm's opinions are supported only by Claimant's subjective allegations. Accordingly, the Court finds that the ALJ's decision to not accord significant weight to the opinions of Dr. Byrd and Dr. Swarm is supported by substantial evidence.

Contrary to Claimant's assertions, the ALJ was entitled to rely on the opinions of the state

17

agency medical consultants as their opinions were consistent with the evidence of record. See Smith v. Schweiker, 795 F.2d 343, 356 (4th Cir. 1986) (stating that "the testimony of a non-examining physician can be relied upon when it is consistent with the record" and that "if the medical expert testimony from examining or treating physicians goes both ways, a determination coming down on the side of the non-examining, non-treating physician should stand."); see also, 20 C.F.R. § 404.1527(f)(2) and SSR 96-5p; SSR 96-6p. The ALJ properly found that the state agency physicians provided specific reasons for their opinions, noting Claimant's allegations of pain and other symptoms, as well as her activities of daily living, which were inconsistent in part with her allegations. These physicians further noted that the medical evidence of record demonstrated that Claimant primarily exhibited tender points as opposed to significant pain, swelling, and stiffness. Accordingly, the Court finds that the ALJ properly considered the opinion evidence of record in conformity with the Regulations and case law and that his decision to accord greater weight to the opinions of the state agency physicians than to Claimant's treating physicians is supported by substantial evidence of record.

2. Severe Impairments.

Claimant next alleges that the ALJ erred in not finding that Claimant's depression was a severe impairment. (Document No. 10 at 10-11.) Claimant contends that the ALJ improperly questioned the propriety of Claimant "using a masters level psychologist to offer opinion evidence but does not have the same reservation when accepting the opinion evidence of a masters level psychologist working for the State Agency." (Id. at 11, n. 3.) Thus, Claimant alleges that if the ALJ failed to give controlling weight to the opinion of Ms. Shively, then the ALJ should not have given greater weight to the opinion of Ms. Wagner. (Id. at 11.)

The Commissioner asserts that the ALJ properly determined that Claimant's depression was

18

not a severe impairment because it did not cause significant limitations on her ability to perform basic work activities. (Document No. 11 at 12-17.) He contends that the ALJ's decision is supported by the mental status evaluation of Ms. Wagner, the opinions of state agency medical consultants, Dr. Binder and Dr. Smith, Claimant's minimal treatment history, and Claimant's self-reports of her abilities. (Id. at 12-13.)

To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe, meaning that it "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2006). Basic work activities are the abilities and aptitudes necessary to do most jobs, including: physical functions such as sitting and standing; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. Id.; §§ 404.1521(b)(1)-(6); 416.921(b)(1)-(6). Conversely, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis in original). An inconsistency between a claimant's allegations about the severity of an impairment and the treatment sought is probative of credibility. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). As discussed above, the determination whether a claimant has a severe impairment is made at the second step of the sequential analysis.

On October 26, 2004, Dr. Byrd noted that Claimant presented with a depressive affect with some cognitive dysfunction. (Tr. at 176.) Dr. Byrd noted that on October 28, 2004, he disapproved of Claimant's request of the Board of Education that her son be permitted to be home-schooled so

19

that he could be with her due to her health. (Tr. at 175.)

On January 17, 2005, Tina Dahl Wagner, M.S., conducted a consultative examination of Claimant at the request of the Bureau of Disability Determination. (Tr. at 16-17, 154-59.) She noted Claimant's reports of feelings of worthlessness, occasional sadness and depression, difficulty sleeping with intermittent awakenings and an inability to remain asleep, weight gain, low energy and fatigue, feelings of hopelessness and helplessness, and anxiety. (Tr. at 16, 155.) On mental status exam, Ms. Wagner observed that Claimant presented with an euthymic mood, broad affect, normal stream of thought and thought content, no delusional or obsessive-compulsive behavior, an absence of hallucinations or illusions, good insight, mildly retarded psychomotor behavior, normal judgment and recent memory, mildly deficient remote memory, normal concentration and persistence, and mildly slow pace. (Tr. at 16, 157.) Ms. Wagner noted Claimant's social functioning included eating out once a month with her family and driving two hours to see her mother-in-law. (Tr. at 16, 157.) Claimant reported that due to financial constraints, she did not get out much and found it difficult to be in public due to an inability to sit or stand for any significant length of time. (Id.) Claimant also reported that her activities of daily living included arising at 5:45 a.m., getting her son off to school by driving him to the bus, lying down and watching television, sometimes going back to sleep, doing laundry, making the bed, and washing dishes on a good day. (Tr. at 16-17, 258.) On a bad day, Claimant reported that she would lie around, watch television, or sit and read. (Tr. at 17, 258.) She noted that her husband did three quarters of the housework and that she was responsible for her own grooming. (Id.) Ms. Wagner diagnosed depressive disorder NOS and opined that her prognosis was fair. (Id.)

On January 18, 2005, James T. Binder, M.D., completed a Psychiatric Review Technique Form on which he opined that Claimant's depression resulted in only mild limitations of activities

of daily living and in maintaining social functioning, concentration, persistence, or pace. (Tr. at 17, 186-99.) He further opined that Claimant had no episodes of decompensation. (Tr. at 17, 197.) Dr. Binder's opinion was affirmed as written by Rosemary L. Smith, Psy.D., on September 2, 2005. (Tr. at 17, 186.)

On February 4, 2005, Dr. Byrd noted that Claimant had depression with cognitive dysfunction. (Tr. at 17, 173.) On February 21, 2005, Dr. Byrd noted that Claimant was undergoing a psychiatric consultation as recommended by the Disability Determination. (Tr. at 17, 171.) He prescribed Effexor XL 37.5mg on May 12, 2005, and noted that while she had some depressive symptoms, she was coping well. (Id.)

Martha L. Shively, M.A., LPCC, a counselor, completed a Medical Assessment of Ability to Do Work-Related Activities (Mental), on July 25, 2006. (Tr. at 18-19, 230-32.) Ms. Shively opined that Claimant had fair ability to relate to co-workers, use judgment, and function independently. (Tr. at 18-19, 230.) However, she further opined that Claimant had poor ability to deal with the public, interact with supervisors, deal with work stresses, and maintain attention and concentration. (Id.) Regarding the ability to make performance adjustment, Ms. Shively opined that Claimant had fair ability to understand, remember, and carry out detailed and complex job instructions. (Tr. at 19, 231.) Finally, regarding the ability to make personal-social adjustments, Ms. Shively opined that Claimant had fair ability to maintain personal appearance and demonstrate reliability. (Id.) Ms. Shively opined that Claimant "would have great difficulty standing, sitting, or having to walk for extended periods. Routine office work requires these activities. Also, due to the presence of high levels of depression that frequently accompanies coping with pain and stiffness of fibromyalgia, this client would potentially miss work frequently." (Tr. at 19, 232.)

Dr. Byrd noted that Claimant presented with a brighter affect in August, 2005, with Effexor.

(Tr. at 235.) He recommended on November 17, 2005, that Claimant see a psychiatrist for some psychological issues with co-morbidity. (Tr. at 235.) Dr. Byrd noted on January 3, 2006, that Claimant continued to experience fragmented sleep and opined that due to her significant cognitive dysfunction and poorly controlled pain syndrome, she was "totally disabled from all except self-care." (Tr. at 234.)

Finally, on August 16, 2006, Ms. Shively noted that Claimant had completed a Health Status Questionnaire, a Brief Battery for Health Improvement, and a Multidimensional Pain Inventory. (Tr. at 19, 247-50.) The Health Status Questionnaire revealed that Claimant had very high levels of depression associated with the medical condition. (Tr. at 19, 250.) The Brief Battery for Health Improvement revealed severe emotional reactions to continuous pain, high levels of anxiety and depression manifested as thoughts of suicide, an underlying anxiety of death, and a sleep disturbance. (Id.) The Multidimensional Pain Inventory revealed a lifestyle that had to change immensely due to fibromyalgia and social isolation due to the pain resulting from preparing to go out. (Tr. at 19, 251.) Ms. Shively opined that frequent absences would be expected in a work situation. (Id.) She recommended therapeutic help for pain management, depression, and anxiety; counseling for depression and anxiety; and possibly physical therapy. (Id.)

The ALJ determined that Claimant's depression with cognitive limitations imposed only mild limitations regarding her activities of daily living and maintaining social functioning, concentration, persistence, or pace. (Tr. at 14.) He further determined that the evidence revealed no episodes of decompensation of extended duration. (Id.) The ALJ noted that Claimant was treated with Effexor, as prescribed by Dr. Byrd, and that she had no psychiatric treatment, counseling, or inpatient treatment. (Id.)

Claimant alleges that the ALJ erred in crediting the opinion of Ms. Wagner, a masters level

psychologist who examined Claimant on one occasion over the opinion of Ms. Shively, also a masters level psychologist who treated Claimant for some time. (Document No. 10 at 10-11.) The Commissioner asserts that Claimant ignores the ALJ's statement "that he is actually relying upon the opinions of the psychiatrist and psychologist who reviewed the evidence of record." (Document No. 11 at 13-14.) Claimant correctly points out that at step two of the sequential analysis, the ALJ relied on the opinions of the state agency medical consultants in finding that Claimant's depression with cognitive dysfunction was not a severe impairment. (Tr. at 14.) It was at steps four and five, in assessing Claimant's residual functional capacity, that the ALJ noted that the "opinion of a Master's level psychologist, Ms. Shively, is not the opinion of a treating medical source, is not based on long-term treatment, and is subjectively based on the claimant's response to a pain questionnaire." (Tr. at 21.) At step two, the evidence, as set forth above, clearly demonstrates that Claimant's depression did not significantly limit her ability to perform basic work activities. Accordingly, the ALJ's finding that Claimant's depression was not a severe impairment is supported by substantial evidence.

3. Pain and Credibility Assessment.

Finally, Claimant alleges that the ALJ erred in summarily rejecting her subjective statements of pain and other symptoms. (Document No. 10 at 11.) Claimant contends that her subjective statements are "born out by reactions of her medical provider to her subjective statements," and that none of the examining sources opined that she was a malingerer or outright liar. (Id.) The Commissioner asserts that the ALJ properly considered the credibility of Claimant's subjective complaints pursuant to the factors set forth in 20 C.F.R. § 404.1529(c) and SSR 96-7p, and therefore, the ALJ's detailed credibility assessment is supported by substantial evidence. (Document No. 11 at 17-20.)

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2006); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's  subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2006). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other

symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2006).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a

25

claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations.  A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless,  Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

In the instant case, the ALJ noted the requirements of the applicable law and Regulations regarding the assessment of pain and credibility. (Tr. at 15-21.) The ALJ found, at the first step of the analysis, that Claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." (Tr. at 16.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 16-21.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and

limiting effects of these symptoms are not entirely credible." (Tr. at 16.)

The ALJ summarized Claimant's testimony in his decision, noting Claimant's testimony that she had problems sleeping and suffered from depression and fibromyalgia, which resulted in pain and swelling of her legs. (Tr. at 15, 265, 265-71.) Claimant testified that the pain sometimes eased, but never fully went away. (Tr. at 15, 274.) The ALJ further noted that Claimant stated that she had chest pains. (Tr. at 15, 276.) The ALJ thus noted the nature and location of Claimant's pain, and further noted that Claimant was treated with medications for her sleeping problems, pain, hypertension, thyroid problems, hypertension, depression, and fibromyalgia. (Tr. at 15, 265-70.) As a consequence of taking these prescribed medications, the ALJ noted Claimant's testimony that she suffered side effects including dizziness, inability to focus, weird feelings, and sleepiness. (Id.) Claimant testified that due to the pain and swelling of her legs, she was not able to shop alone and had to have her sons help her load and unload groceries. (Tr. at 15, 271.) Following any shopping trips, Claimant testified that it took her a couple of days to recover. (Id.) To alleviate the swelling of her legs, Claimant stated that she sat in a reclining chair. (Tr. at 15, 273.) Claimant testified though that her blood pressure medication improved her stress. (Tr. at 16.) The ALJ further noted Claimant's testimony that she could walk for only three to five minutes without resting, could sit at a desk and perform tasks with her hands for only ten to fifteen minutes, that she could not type because her fingers would cramp, and that she could carry five pounds but that items fell out of her hands due to an inability to grip. (Tr. at 15, 272-75.)

The ALJ also summarized in his decision, Claimant's activities of daily living. (Tr. at 15-16.) He noted Claimant's testimony that she arose every morning at 5:45 a.m., sat, walked for a while, and then sat again for forty minutes, which caused her legs to swell. (Tr. at 15, 272-79.) She testified that she did very little work around the house and that her husband helped her in and out of the

shower because she had fallen in the past. (Tr. at 15-16, 276.) Claimant stated that her husband cooked and cleaned and that her son occasionally assisted him. (Id.) She testified that depression made her feel useless. (Tr. at 16, 277.) The ALJ noted Claimant's testimony that she visited her mother and her next door neighbor, but that her mind constantly raced. (Tr. at 16, 278-79.) He further noted that Claimant stated that she did not watch television for prolonged periods of time but read the newspaper. (Tr. at 16, 279.) On a form Function Report dated December 5, 2004, Claimant testified that she prepared simple meals such as a sandwich or frozen dinner on a daily basis, that she drove or rode in a vehicle, that she shopped twice a month for groceries with the assistance from others, watched television and read, talked with others, and played cards and board games with her family on a daily basis. (Tr. at 20-21, 89-96.)

The ALJ further summarized the testimony of Claimant's husband, Dale McGuire. (Tr. at 16, 281-84.) The ALJ noted that Mr. McGuire stated that Claimant experienced pain in her arms, legs, and back, and that she would wake screaming due to pain. (Tr. at 16, 282.) He testified that he made the beds, washed the dishes, and did the laundry though Claimant was able to fold clothing. (Tr. at 16, 282-83.) Mr. McGuire further testified that he mowed the yard, took Claimant to her medical appointments or to her mother-in-law's home, and laid down during the day or slept in a reclining chair. (Tr. at 16, 283-84.) The ALJ noted Mr. McGuire's testimony that he and his family used to go camping but would come home early due to Claimant's impairments. (Tr. at 16, 283.) He testified that Claimant could not do the activities that she once did and that her conditions caused her to feel guilty, which in turned caused her to cry. (Tr. at 16, 284.)

In addition to Claimant's and Mr. McGuire's testimony, the ALJ also summarized the medical evidence of record, as discussed above, noting that he specifically considered Claimant's obesity. (Tr. at 16-21.) After considering the evidence of record, the ALJ determined that Claimant's

28

"allegations regarding the severity, chronicity and debilitating nature of her limitations, her subjective complaints of pain, her inability to work, and her inabilities to perform functional activities, activities of daily living and work-related activities are not credible." (Tr. at 20.) Despite Claimant's reports of limited activities, the ALJ noted that she told Ms. Wagner on January 17, 2005, that on good days, she made the beds, did the laundry, washed dishes, and either watched television or read the remainder of the day. (Tr. at 20, 158.) The ALJ noted that Claimant's physicians told her to continue to lose weight which would relieve her muscles and bones from additional stress and reduce her pain. (Tr. at 20.) More importantly, the ALJ noted that Claimant's treating physician, Dr. Byrd, recommended that she perform low impact exercises, "an indication that the claimant's conditions would be improved by exercises and activity which would also promote weight loss." (Tr. at 20, 234-35.) Though Claimant testified that she essentially did nothing throughout the day, the ALJ noted her reports of cooking and playing board games and cards with her family. (Tr. at 20.) Furthermore, the ALJ found that Claimant's complaints of pain were exaggerated. (Tr. at 20.) While she may have had some pain, the ALJ noted that the pain was not debilitating because she shopped, performed at least some household chores, cared for her son, helped her son with his homework, visited her mother and neighbor, and drove. (Tr. at 20.) The Commissioner properly notes that the "absence of an indication that a medical provider believed a claimant to be lying does not, by itself, render her immune to a credibility analysis." (Document No. 11 at 18.)

The ALJ also noted that Claimant's allegations were inconsistent with the medical evidence of record. (Tr. at 20-21.) As discussed above, Claimant exhibited normal ranges of motion, straight leg raising, and strength, motor, and reflex function. Regarding her mental limitations, Claimant presented with a euthymic mood, broad affect, normal stream of thought, normal thought content,

29

good insight, only mildly retarded psychomotor behavior, normal judgment, normal recent memory, normal concentration and persistence, and only mildly deficient remote memory and pace. (Tr. at 20-21, 157.) As the Commissioner notes, Claimant did not seek treatment for her depression until nearly two years after her alleged onset date. (Document No. 11 at 19.)

Regarding Claimant's mental abilities, the ALJ noted, as discussed above, that Ms. Shively was Claimant's treating counselor. (Tr. at 19.) The ALJ discounted Ms. Shively's opinion because it was the "opinion of a Master's level psychologist . . . not the opinion of a treating medical source, is not based on long-term treatment, and is subjectively based on the claimant's response to a pain questionnaire." (Tr. at 21.) The ALJ noted that the first evaluating psychologist, Ms. Wagner, neither recommended ongoing treatment, nor concluded that Claimant was disabled. (Id.) Contrary to Claimant's allegations, the ALJ specifically noted that both Ms. Shively and Ms. Wagner were Master's level evaluating psychologists. (Tr. at 20.) Nevertheless, Ms. Shively's opinions were based primarily on Claimant's subjective allegations, and are not reflected elsewhere in the medical record. Though Claimant alleges that she treated with Ms. Shively, the treatment notes were not made a part of the record. The only other evidence by an examining source was that of Ms. Wagner, whose assessment appeared consistent with the insubstantial evidence supporting Claimant's depression. Accordingly, the Court finds no error in the ALJ's assessment of Ms. Shively's and Ms. Wagner's evaluations and opinions.

Based on the foregoing, the Court finds that the ALJ properly considered the factors under 20 C.F.R. § 404.1529(c)(4) and 416.929(c)(4), as well as the testimony and medical evidence of record in finding Claimant not entirely credible. Accordingly, the Court finds that the ALJ properly considered Claimant's subjective allegations and that his pain and credibility assessment is supported by substantial evidence.

30

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 9.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 11.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: September 26, 2008.

R. Clarke VanDervort
United States Magistrate Judge